

FILED
October 4, 2016
Third Court of Appeals
Jeffrey D. Kyle
Clerk

ACCEPTED
03-15-00420-CR
12911938
THIRD COURT OF APPEALS
AUSTIN, TEXAS
9/26/2016 10:27:57 PM
JEFFREY D. KYLE
CLERK

NO. 03-15-00420-CR

**IN THE COURT OF APPEALS**

**FOR THE**

RECEIVED IN
3rd COURT OF APPEALS
AUSTIN, TEXAS
9/26/2016 10:27:57 PM
JEFFREY D. KYLE
Clerk

**THIRD SUPREME JUDICIAL DISTRICT**

**AT AUSTIN, TEXAS**

---

**KARRA TRICHELE ALLEN,**
**Appellant**

**vs.**

**THE STATE OF TEXAS,**
**Appellee**

---

**Appeal from the 33rd Judicial District Court**
**Cause No. 42765**
**Burnet County, Texas**
**The Honorable J. Allan Garrett, Judge Presiding**

---

**APPELLANT'S BRIEF**

---

**Gary E. Prust**
**State Bar No. 24056166**
**1607 Nueces Street**
**Austin, Texas 78701**
**(512) 469-0092**
**Fax: (512) 469-9102**
**gary@prustlaw.com**

**ATTORNEY FOR APPELLANT**

# IDENTITY OF THE PARTIES

**APPELLANT:**
Karra Trichele Allen
Mountain View Unit
2305 Ransom Rd.
Gatesville, TX 76528

**TRIAL COUNSEL FOR APPELLANT:**

| | |
|---|---|
| Eddie Shell | Bobbi Shell |
| SBN 18191650 | SBN 24083499 |

Kirby Crow
SBN 24094606
6000 N. Hwy 281
Marble Falls, TX 78654

**APPELLATE COUNSEL FOR APPELLANT:**
Gary E. Prust
SBN 24056166
Law Office of Gary E. Prust
1607 Nueces St.
Austin, TX 78701

**TRIAL COUNSEL FOR APPELLEE:**

| | |
|---|---|
| Wiley "Sonny" McAfee, Jr. | Peter Keim |
| SBN 13318020 | SBN 15532500 |

33rd and 424th Judicial District Attorney's Office
PO Box 725
Llano, TX 78643

**APPELLATE COUNSEL FOR APPELLEE:**
Gary W. Bunyard
SBN 03353500
33rd and 424th Judicial District Attorney's Office
PO Box 725
Llano, TX 78643

# TABLE OF CONTENTS

Identity of the Parties ...............................................................................................ii

Table of Contents ....................................................................................................iii

Table of Authorities................................................................................................. v

Statement of the Case.............................................................................................. 1

Statement Regarding Oral Argument ...................................................................... 1

Issues Presented ...................................................................................................... 2

     I.     Appellant suffered egregious harm because the jury instructions omitted the presumption of reasonableness that the use of deadly force was immediately necessary.

     II.     Appellant suffered egregious harm because jury instruction on the law of self-defense omitted a significant portion of the law on use of deadly force in self-defense.

     III.     Appellant suffered egregious harm because the jury instructions included extra-statutory language regarding self-defense in response to verbal provocation not permitted by the penal code.

     IV.     The cumulative effect of the numerous errors in the jury instructions has resulted in a constitutional due process violation because Appellant was denied the right to have a legal defense accurately presented to the jury.

Statement of the Facts ............................................................................................. 3

Summary of the Argument ..................................................................................... 40

Argument ............................................................................................................... 42

     Argument on Issues I, II, III ....................................................................... 42

Argument on Issue IV ................................................................................ 68

Prayer ....................................................................................................... 72

Certificate of Service ............................................................................... 73

Certificate of Compliance ........................................................................ 73

Appendix .................................................................................................. 74

# TABLE OF AUTHORITIES

**CASES**

*Abdnor v. State*, 871 S.W.2d 726, 731 (Tex. Crim. App. 1994) ..............................47

*Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1984) ................43, 45, 65

*Chamberlain v. State*, 998 S.W.2d 230, 238 (Tex. Crim. App. 1999) .....................66

*Cole v. Arkansas*, 333 U.S. 196, 201 (1948) ..........................................................65

*Cosia v. State*, 353 S.W.3d 766, 777 (Tex. Crim. App. 2011) ...............................43

*Dugar v. State*, 464 S.W.3d 811, 816
    (Tex.App.—Houston [14th Dist] 2015, pet. ref'd) ...............................46, 48

*Estrada v. State*, 313 S.W.3d 274, 311 (Tex. Crim. App. 2010) ............................66

*McIntosh v. State*, 297 S.W.3d 536, 542-43
    (Tex.App.—Houston [1st Dist.] 2009, pet. ref'd) ........................................45

*Ngo v. State*, 175 S.W.3d 738, 744 (Tex. Crim. App. 2005) ..................................42

*Vega v. State*, 394 S.W.3d 514, 519 (Tex. Crim. App. 2013) .................................46

*Villareal v. State*, 453 S.W.3d 429, 433 (Tex. Crim. App. 2015) ....42, 48, 52, 58, 59

*Walters v. State*, 247 S.W.3d 204, 212
    (Tex. Crim. App. 2007) (reh'g denied) .................................................46, 62

**STATUTES**

TEX. CODE CRIM. PROC. art. 36.14 (West 2013) ...................................45, 47, 48, 65

TEX. CODE CRIM. PROC. art. 36.19 (West 2013) ....................................................45

TEX. PEN. CODE § 2.05(b)(2) (West 2013) ..............................................................45

TEX. PEN. CODE § 2.95(b)(1) (West 2013) ..............................................................44

TEX. PEN. CODE § 9.31(West 2013) ...................................................49, 50, 61, 66

TEX. PEN. CODE § 9.31(a) (West 2013).........................................................43, 51

TEX. PEN. CODE § 9.31(b)(1) (West 2013)........................................................62

TEX. PEN. CODE § 9.32 (West 2013)..........................................................49, 50

TEX. PEN. CODE § 9.32(a) (West 2013).......................................................44, 50

TEX. PEN. CODE § 9.32(a)(2) (West 2013)...................................................50, 66

TEX. PEN. CODE § 9.32(a)(3) (West 2013)........................................................44

TEX. PEN. CODE § 9.32(b) (West 2013).............................................44, 48, 51, 67

TEX. PEN. CODE § 9.32(b)(1)(B) (West 2013)...................................................51

TEX. PEN. CODE § 9.32(b)(2) (West 2013)...........................................44, 51, 62

**RULES**

TEX. R. APP. P. 44.2(a).............................................................................67

**CONSTITUTIONAL PROVISIONS**

TEX. CONST. art. I § 19............................................................................65

UNITED STATES CONST. Amend. V ...........................................................65

# STATEMENT OF THE CASE

*Nature of the case:*　　　This is an appeal from a criminal conviction for murder.

*Course of the proceedings:*　The offense was alleged to have occurred on or about July 1, 2013. CR 5. An indictment was returned May 6, 2014. CR 4. A legnthy jury trial on guilt/innocence began May 18, 2015 *See* I RR *passim*. The same jury also heard the punishment case and returned a verdict of life in prison. CR 97.

*Trial court's disposition:*　The trial court imposed sentence in compliance with the verdict of the jury. CR 99-100.

# STATEMENT REGARDING ORAL ARGUMENT

Appellant requests oral argument and believes the Court will be aided by oral argument of counsel.

## ISSUES PRESENTED

**I.      Appellant suffered egregious harm because the jury instructions omitted the presumption of reasonableness that the use of deadly force was immediately necessary.**

**II.      Appellant suffered egregious harm because jury instructions on the law of self-defense omitted a significant portion of the law on use of deadly force in self-defense.**

**III.      Appellant suffered egregious harm because the jury instructions included extra-statutory language regarding self-defense in response to verbal provocation not permitted by the penal code.**

**IV.      The cumulative effect of the numerous errors in the jury instructions has resulted in a constitutional due process violation because Appellant was denied the right to have a legal defense accurately presented to the jury.**

# STATEMENT OF FACTS

Victims of spousal abuse can have a hard time leaving, even under horrible circumstances. XII RR 113. Perpetrators of abuse often don't like others to know about it and want to maintain control over the victim. XII RR 113-14. Someone who is a victim can love the person that is the abuser. XII RR 114.

Brian Allen contacted Robert Henley, a licensed professional counselor in 2013, to work on his serious problems with anger management, domestic violence, , aggression and hostility, and alcohol abuse. XIV RR 242-43; XV RR 98. Henley met with Brian three times and met with Trichele Allen, his spouse, two times. XIV RR 243; XV RR 104. When Brian visited with Henley and was very direct, made negative statement about himself and was unhappy about his outbursts. XV RR 100. Brian went so far as to say that he treated his wife "like shit". XV RR 100. He talked about past domestic violence, anger, alcohol abuse and said he wanted help to fix those problems. XV RR 100.

Brian went on to tell Henley that Trichele treated him well and that she is every man's dream. XV RR 102. Brian, however, also complained Trichele spent a lot of money, was lazy, and did not have a job. XV RR 109. He noted that he was "effed in the head for the way [he] treat[s] her." XV RR 102. Brian loved Trichele, felt he should divorce her, but said he did not want her to leave. XV RR 102-03.

He claimed responsibility for the domestic violence in the home. XV 126. He even noted that he is twice her size and mainly causes the fighting. XV RR 126. Trichele contacted Henley to try to start services again after Brian lapsed for a little while. XV RR 105.

When Trichele met with Henley, she related that she had anger problems within the relationship, too. XV RR 107. The history she gave was consistent with the history provided by Brian. XV RR 111. She also met with Henley after the shooting to discuss it. XV RR 116. Trichele said there was drinking, Brian came home stressed and angry, and he made some comments to her. XV RR 117. After that there was some conflict in the bedroom, then a struggle for a gun, and some shots were fired, but the gun was not loaded. XV RR 117. Brian then reloaded the gun, handed it back to her, and another struggle ensued, and Trichele then fired. XV RR 117.

Noel Busch-Armerendiz (Dr. Busch or Busch) is the director of the Institute on Domestive Violence and Sexual Assault at the University of Texas at Austin. XIV RR 270. Specifically, she works in the field of interpersonal violence. XIV RR 271. She described interpersonal violence as not being about physical violence or one specific instance. XIV RR 273. Rather, it is about the strategies used to control an intimate partner. XIV RR 273. She was able to ultimately conclude that people with a history like that of the Allens' and in a situation similar to that of

Trichele will react with lethal force to defend themselves. XIV RR 274-75. The accumulation of the long history of violence like the Allen's can lead to the belief in the need for lethal force. XV RR 11. The belief that you are going to die is found in intimate partner homicides. XIV RR 279. Due to that belief, people will defend themselves. XIV RR 279. Indeed, the shooting was in self-defense. XV RR 11.

Abusers will utilize strategies to gain control in relationships. XV RR 31. Physical violence often is not present at the beginning of a relationship; rather it is verbal abuse, financial control, and manipulation used. XV RR 31. Abused people in relationships don't always permanently leave. XV RR 33. They continuously leave, such as going to hide or getting in the car and leaving immediately. XV RR 33.

Dr. Bush review various items of discovery in Trichele's case, including an interview with her. XV RR 39. She also read over Mr. Henley's notes of what Brian Allen said and spoke with him for clarification on those notes. XV RR 44. She concluded the Allens loved each other, but Trichele left many times without ever leaving for good. XV RR 39. Dr. Bush also felt Trichele became estranged from her family and isolated form her support system, also common in abuse situations. XV RR 40. By the time the couple began counseling, intervention was difficult because of the cumulative effect of the partner violence over time. XV RR 52.

The accumulation of the relationship history forms the frame of mind of the people involved at the event in question. XV RR 52. The summation of fear and intimidation all adds to the reaction. XV RR 52. In addition, the prior instances of abuse and the escalating intensity of those events also factor in, as well as the use of weapons in the violence. XV RR 53. Reaching out to police without any results also factor in. XV RR 55. Especially in a situation where an abused person reaches out multiple times and it doesn't work. XV RR 55.

After reviewing all necessary information, Bush ultimately concluded that Brian was an abusive husband to Trichele over many years. XV RR 85. The abuse had been escalating for years before the event and had been escalating that day. XV RR 85-86. Trichele was in fear of her life the day of the shooting. XV RR 86. The use of deadly force in defense of her life was necessary from her standpoint because of the cumulative effect of the violence over time and the escalation of violence over time at the hands of Brian. XV RR 86. Indeed, Dr. Busch concluded thet when a reasonable belief is defined as that held by an ordinary and prudent person in the same circumstances as the actor, Trichele had a reasonable belief that her life was in danger. XV RR 90-91.

Trichele Allen moved to Austin, Texas around 2001. XIV RR 104. One night she met Brian Allen when she went out one night and brought him to the house the next day. XIV RR 16. The two eventually moved in and lived together, off and on

for several years. VIII RR 81-83; *see also* VIII RR 144. They also argued and fought frequently. VIII RR 84-85. It wasn't long after they dated that Ms. Stapleton, Trichele's mother, started to become concerned about the relationship. XIV RR 19. She went to their house one day and found the door from the garage to the house was kicked in, and Brian was loading things into his truck. XIV RR 19. Trichele was holding her face and it was red on one side. XIV RR 20. Ms. Stapleton gave advice to Trichele that she should not stay with a man who would hit her. XIV RR 22. Ms Stapleton in later years would witness other indications of abuse: a black eye covered with makeup; XIV RR 31-32; a large amount of hair pulled out from the side of her head XIV RR 34.

Trichele's sister, Chantaye Patton, was also around at the start of Brian and Trichele's relationship. XIV RR 107. The first instance of violence Patton saw came when she was visiting their home, and the children were upstairs. XIV RR 110. Trichele was working the AA program and hadn't been drinking, but Brian was. XIV RR 110. The two began arguing which then began to escalate. XIV RR 110. Brian then struck Trichele with the back of his hand. XIV RR 110. He struck her hard enough to make her start to fall out of her chair. XIV RR 111. Brian picked her back up and put her back in the chair. XIV RR 111. At that time, as far as Patton knew, this was out of character for Brian. XIV RR 113. From then on, she had no respect for him. XIV RR 113.

Over the years, Kevin Allen, Brian's brother, saw Trichele criticize Brian often, usually after she had been drinking. VIII RR 85-87. However, Brian drank a lot as well. VIII RR 99. Kevin was also aware of an incident in Robinson, Texas which lead to Brian Allen being charged with assault family violence. VIII RR 100-01. He was under the impression Appellant caused the incident by grabbing the steering wheel and that Appellant slapped herself to cause injuries. VIII RR 102. Kevin also noted that in order to gain federal contracts, Brian transferred 51 percent ownership of the company to his wife. VIII RR 91-92.

Back in 2002, Austin Police Corporal Andrew Kos went to the house on Tiffany Lane to respond to a 911 hang up call. XVI 26. Kos met Trichele who said she was mad at Brian because he was flirting with another woman at a club they went to and got into an argument about it on the way home. XVI RR 28. Trichele admitted to pouring a drink into Brian's lap during the argument. XVI RR 29. Brian then grabbed Trichele's hair, and he slammed her head into the vehicle's console. XVI RR 29. She then started hitting, kicking, and scratching him. XVI 29.

Kos did not see any redness on Trichele to show she had been assaulted. XVI RR 30. He did, however, notice minor scratches and injuries on Brian. XVI RR 31; 35. Brian denied striking Trichele but also said they couple needed counseling. XVI RR 36. Kos arrested Trichele for assaulting Brian. XVI 32.

Terry Hancock was a witness to an incident on the side of interstate 35 in

2004, near Robinson, Texas. X RR 40. He was driving down the highway and saw an eight or nine-year-old child who appeared distraught and said his father was beating up on his mother. X RR 51. He then saw a male drag a lady out of a car and violently strike her twice. X RR 51-52. Hancock then called 911, filled out a statement for the police, and saw the man (later identified as Brian Allen) arrested. X RR 53.

Brian came into Hunter Allen's life when he was in the first grade. XII 171. He came into Jacob Allen's when Jacob was six years old. XIII RR 155. Hunter and Jacob are Trichele's son, and they eventually moved from Austin into a trailer in Burnet County. XII RR 173. Because of the fighting and arguing, Trichele moved away from Brian into an apartment for a few months. XII RR 174. Later, Hunter and his mother moved around some with and without Brian for several years. XII RR 178-79. Even with the on-again and off-again relationship, Brian treated Hunter and Jacob as though they were his own sons. XII RR 183; XIII RR 155. Hunter described the physical fighting as Trichele slapping Brian at times, and Brian only restraining Trichele as best he could. XII RR 184. He thought it wasn't likely that Trichele was being abused behind closed doors, but he added that he "wasn't behind closed doors". XII RR 199.

There was no time in Jacob Allen's life when Trichele was not getting hit or beaten by Brian. XIII RR 177. Jacob, however, noted that his parents fought, at

9

least verbally, every other day since he could remember. XIII RR 162. They fought physically at least one time every week. XIII RR 162. Both parties would start the fights. XIII RR 162. Brian would usually grab her head and had slammed it into the ground on several occasion. XIII RR 162-63. Most times, Brian would hold Trichele down and she would be hitting him trying to get away. XIII RR 162-63. Trichele would react by trying to escape: She would take her dogs and go to a hotel; she would hide the guest room above the carport; she would hide in the tanning bed; she would hide in the attic from Brian; she would hide in the media room and push the sofa against the door. XIII RR 210-11. Brian would push the door to the media room trying to get in. XIII RR 214. Sometimes, Jacob feared his mother would not survive the assaults. XIII RR 164.

Jacob specifically recalled an event at his uncle Kevin's house with a brutal assault. XIII RR 166. He walked out to see Brian on top of Trichele holding her head down onto the concrete and repeatedly slamming it down. XIII RR 166. Kevin was able to get Brian off of Trichele and inside the house. XIII RR 166. The two were separated all night. XIII RR 166.

Jacob also recalled the 2004 assault in Robinson, Texas. XIII RR 157. He remembers Brian and Trichele arguing before leaving his uncle Kevin's house. XIII RR 157-58. While driving, Brian reached over and grabbed Trichele's head, slammed it into the dashboard and held it there. XIII RR 158. Trichele then

reached for the steering wheel and pulled as hard as she could, causing the truck to veer off the side of the road. XIII RR 158. When the truck came to a stop, Brian got out, ran to the passenger side and began to drag Trichele out of the truck by her hair. XIII RR 158-59. Trichele screamed for her boys to get help. XIII RR 159.

Hunter, gave a different version of the same fight. XII RR 192. He said Trichele started slapping Brian and he was only trying to restrain her from hitting him while he was driving. XII RR 192. According to Hunter, Trichele went so far as to turn around and kick Brian in the face, which Brian fought off. XII RR 192.

In 2005, Trichele Allen went to the home of Michelle Walters, unexpectedly. XII RR 18. Brian had spent the night with Walters. XII RR 17-18. Brian went outside and began loudly arguing and fighting with Trichele. XII RR 20. Trichele was hitting Brian and "trying to get by him". XII RR 20. Trichele then entered the apartment and confronted Walters who ran and hid in the bathroom then called the police. XII RR 22, 23. Walters felt Trichele was upset and trying to get at her. XII RR 22.

Tracy Lawrence was with the Austin Police Department when she went out to that disturbance. XVI RR 44. There Lawrence met Trichele who appeared panicked, was breathing heavily, and said she had been arguing with her ex-boyfriend. XVI RR 45-46. They lived in the same apartment complex, and she was walking her dog when she saw his pickup truck and an encounter ensued. XVI RR

11

46. She also related that a week before the two had been in a fight where he tried to kill her and that he had been arrested, and supposedly a protective order issued. XVI RR 46. However, Brian was on probation in McLennan County for a family violence charge and protective orders are commonly included as a condition of probation. XVI RR 56-58. Lawrence searched through dispatch and could not find any protective order by either party. XVI RR 47.

Trichele left during Lawrence's investigation. XVI RR 47-48. Officers had Brian call her and she refused to return to the area because she was afraid of going to jail. XVI RR 50.

After everything calmed down and the police left, Trichele came back the next night to speak with Walters. XII RR 24-25. The two visited for two or three hours and Trichele explained that if Walters pressed charges, she would lose her son. XII RR 25. Trichele also explained that she wanted to marry Brian, but Walters believed Trichele and Brian to be broken up at the time. XII RR 26. After that evening, the two did not communicate much. XII RR 28.

Later on Hunter was in the eighth grade, snuck out of the house, was caught, and returned home by police. XV RR 142. His mother became furious at him, began hitting him on the chest, reached down to pull his testicles away from his body, and slapped his chest some more. XV RR 44. The assault continued for two minutes until Trichele left the room. XV RR 144. He also told of an incident when

12

he was made to stay in a dog kennel as punishment for not cleaning it out. XV RR 144-45.

In December 2006, a City of Bertram police officer took Trichele Burnet County Sheriff's Office. XIV RR 199, 212. She had been crying, appeared distressed, had a red face, and her upper lip was swollen. XIV RR 200. She met with Deputy Richard Bennet who took a report and written statement. XIV RR 200. She said Brian was repeatedly punching her in the nose and mouth, and she had to run out of the house through the back door, get into her car, went to Bertram, and then to the sheriff's office in Burnet. XIV RR 205, 203. She further described that Brian was cursing at her, called her lazy, grabbed her by the hair, drug her off the bed two times. XIV RR 211. Unsurprisingly, she complained of pain in her nose, lips, teeth, and jaw. XIV RR 212. Despite all this, Trichele said she wasn't sure that she wanted to proceed with a prosecution. XIV RR 201.

Gary Holland worked for Brian and Trichele and would go to their house about three or four times a week for social purposes. XIV RR 68. He saw the good and the bad moments between Brian and Trichele over the years. XIV RR 68. The first assault he recalled was everyone was sitting out by the pool and Brian coming out of the house. XIV RR 68. Brian started throwing rocks at Trichele who was floating on a raft in the pool. XIV RR 68. He then jumped in, threw her off the raft, and held her underwater. XIV RR 68. Holland managed to pull Brian off her. XIV

13

RR 68. When he did, Brian got mad and tried to keep Holland off the property. XIV RR 68.

Another time, Holland was at their property when he witnessed more violence. XIV RR 69-70. As the evening was winding down, Brian went to get another drink, and Trichele went to her room and locked the door. XIV RR 71. By this point the two had already been arguing, and Brian was mad. XIV RR 71.

Brian came up where Holland was and asked about Trichele. XIV RR 71. When he learned Trichele went to her room, he went down, and opened the door. XIV RR 71. By the time Holland got there, Brian grabbed Trichele by the hair with both his hands and was dragging and throwing her around the room. XIV RR 71. Holland managed to get Brian to stop. XIV RR 71.

Holland saw another time when Trichele was missing chunks of hair. XIV RR 73. He saw several other times which caused him to believe abuse was ongoing. XIV RR 77; 84-85. He saw busted lips, black eyes, and head lumps on Trichele. XIV RR 77. There was another instance when Brian pulled Trichele out of her hummer, threw her on the ground, and began kicking her. XIV RR 81. When police arrived, Holland convinced them to not arrest Brian and to separate the pair. XIV RR 82. Holland saw drawings made by Trichele depicting how abuse occured which she kept in a safe in her room. XIV RR 77-79. After the shooting, Holland opened the safe at the request of Kevin Allen who grabbed them, then burned them

in a barbeque pit next to Rick Allen's (the father of the Allen boys) house. XIV RR 80.[1] Holland was told it was done so there would be no written proof of the abuse. XIV RR 80. Ultimately, Holland concluded the abuse was becoming worse over time. XIV RR 81.

After the backhand incident early in the Allens' relationship, Ms. Patton saw at least five other times when she had seen Trichele with a black eye. XIV RR 116. She also once had a cauliflowered ear. XIV RR 116. Patton later moved to north Texas and at one point had Brian and Trichele over for dinner. XIV RR 117. After dinner, Patton heard arguing, came around the corner, and saw Brian holding Trichele in a chokehold. XIV RR 117. Trichele's face was extremely red. XIV RR 118.

At the Stapleton home in 2009, Ms. Stapleton was home while her husband had gone for cancer treatment. XIV RR 27. Trichele and Brian came in the house, Brian screaming at her calling her an "'effin' bitch'" and also exclaiming, "We're not going to the party. I'm not going out. I'm not going out with your [effing] parents." XIV RR 27. He then shoved Trichele against a corner of the wall. XIV RR 27. The wall-corner cracked and she screamed out. XIV RR 28. Stapleton then came near the room they were in just to where they could not see her. XIV RR 27. She then walked in and asked what was happening. XIV RR 29. Brian saw her and

---

[1] Kevin Allen, on redirect, categorically denied breaking into the safe with Gary Holland. XV RR 130.

said they were joking around. XIV RR 29. Later, Ms. Stapleton gave the same advice she gave before: You shouldn't be with a man who is hitting you. XIV RR 29.

Tish Sawl knew Brian and Trichele, not personally, but from living in the same small town. XIII RR 231-32. In 2008 or 2009 Tish was at a restaurant called the Smoke House and when she saw Brian backhand Trichele across the face. XIII RR 234. The strike was so hard, it knocked her to the floor. XIII RR 235. He then grabbed her on each side of her head by the hair, lifted her off the ground and slammed her back into the chair while shouting at her. XIII RR 235. Trichele was screaming at Brian to stop. XIII RR 236. Two other men near the bar, came shouting Brian's name. XIII RR 236. He then stopped shouting at her and called her vulgar names. XIII RR 235-36. Trichele was able to get up and leave. XIII RR 236.

Another time, on a weekend, the Trichele's side of the family went to Burnet County for a child's birthday party. XIV RR 120-21. In the evening, the guests were in the detached guest house, and Brian and Trichele were in the main house. XIV RR 123. Ms. Patton came inside the main house and heard shouting. XIV RR 123. She ran to look in the main area where she saw Brian grabbing Trichele by the back of her head, grabbing her by the back of her hair, pulling he to the floor, and kicking her after she was down. XIV RR 123.

Kristen Davis, a deputy with the Burnet County Sheriff's Office, was dispatched to an assault on May 27, 2009. XIV RR 178, 180. She arrived and found Trichele who appeared upset, had red marks around her neck, and had been crying. XIV RR 181. Trichele reported she had been strangled, and the marks were consistent with the story she relayed to Davis. XIV RR 182-83. Trichele, however, refused to provide a statement. XIV RR 182. Davis encouraged her to press charges despite Trichele's refusal. XIV RR 194. Davis later learned Trichele filed a letter of nonprosecution, asking that charges not be pursued against Brian. XIV RR 183.

Mike Cochran, in March of 2011, was the primary deputy at a scene at the Allen residence. XIV RR 217-18. When he approached the house, he saw a green vehicle leaving and found Trichele and Jo Lee Marshall in it. XIV RR 219. He had them go back toward the house, where he found Brian detained by another officer. XIV RR 221. He took statements from all involved, including Rick Allen the former chief deputy with the Burnet County Sheriff. XIV RR 221-22. Marshall and Trichele tended to agree on one side, and Brian and Rick tended to agree on the other side. XIV RR 224. Trichele's statement said she wanted to leave, but Brian wouldn't let her. XIV RR 225. Her goal seemed to be able to just leave, and she did not want to file any charges XIV RR 226.

In early 2013, the couple went to north Texas where Trichele's father was

battling cancer. XIV RR 126. One evening, Trichele and Brian came back to the house drunk and bickering with one another. XIV RR 127. Patton told them not to fight in her house with her children upstairs. XIV RR 128. They went outside, and Patton heard more shouting. XIV RR 128. Trichele was red in the face and shouting for Brian to stop hitting her. XIV RR 128. But Brian was not hitting her. XIV RR 128-29. Patton told Brian to leave but offered to allow Trichele to stay. XIV RR 129. Trichele chose to leave with Brian. XIV RR 129. Patton saw no other assault but did see other bruises and evidence of family violence. XIV RR 130.

Also in early 2013, Brian came home from the bar where he had been drinking and met Hunter who had been drinking at the house. XII RR 193. They got into an argument and Hunter confronted Brian about being a grown man. XII RR 193. Brian then "put [him] in [his] place." XII RR 193. Brian also confronted Hunter and Trichele about using synthetic marijuana. XII RR 194. According to Hunter and trial, Gary Holland grabbed Hunter while Trichele kicked him in the groin until Hunter was able to break free. XII RR 194. Trichele called the police. XII RR 193.

However, at the time of the incident, Hunter told the police that Gary Holland stepped in a separated Briand and Hunter. He said that Holland had not assaulted him at all. XII RR 205.

At this incident, Hunter completed a witness statement saying he had been

18

abused his entire life. XII RR 195. At trial, Hunter claimed he was intoxicated when he completed the form, and he had never been abused by Brian. XII RR 196.

Jacob recounted that Hunter was intoxicated the night of this fight and saw Brian hit Hunter in the face with an open hand. XIII RR 169. Hunter then tried to respond in kind. XIII RR 169-70. Gary Holland got involved and tried to stop the two from hitting each other. XIII RR 170. Brian already had Hunter on the ground and was striking him in the groin. XIII RR 170.

Naomi Allen, Brian Allen's sister-in-law, had seen Trichele Allen drunk many times. X RR 9-10. She would start as funny buy progress into an irritating and ugly demeanor. X RR 10. Trichele would poke fun at Brian and say embarrassing things. X RR 10-11. She had never heard Brian say nasty things to Trichele. X RR 22. If some abuse had occurred, Naomi felt she was close enough that she would have known about it. X RR 22. Naomi Allen, however, had never seen Brian physically attack Trichele after she would make such comments. X RR 12. She had never seem Trichele attack Brian, either. X RR 12. Trichele had never confided in Naomi that Brian beat her, though Naomi felt Trichele confided other personal matters to her. X RR 15-16. Naomi and her husband went to the Allen house after the incident and believed the gun used to kill Brian was missing. X RR 19. They found a weapon in a chest of drawers and Kevin took the weapon. X RR 21.

Naomi, however, had never seen texts messages from Brian to Trichele where he called her various vulgar names. XXI RR 44, *see also* Def. Exh. 10. This was proffered by defense counsel but kept out of evidence before the jury. Counsel for defendant stated part of his theme in the case was underlying abuse by Brian that his family did not know about. X RR 25, *et seq*. When asked to cross-examine the witness concerning her testimony that she never heard Brian call Trichele names or assault her, the trial court sustained the state's objection. X RR 29-30. Naomi was also unaware that Brian served two years of probation for family violence on Trichele. X RR 48.

At the end of June 2013, Danny Hoofnel and his wife were to meet Trichele and Brian at a restaurant San Antonio for a weekend getaway. VIII RR 146-47. When they arrived and looked for the Allens, Hoofnel was told they left the restaurant. VIII RR 149. Trichele sent texts to Hoofnel's wife which left him with the impression that she was jealous that Brian would pay attention to someone other than her. Somewhere around 7 p.m., Hoofnel learned Trichele was arrested after the police went to their hotel room. VIII RR 152-53.

Hoofnel also noted Trichele "could be a nice girl. She could be a sweet girl. She could be fun even if she's drinking a little bit, but she never drank just a little bit. She never did just a little bit of anything." VIII RR 166. At the same time, Hoofnel noted Brian was 6 foot 4 inches tall, over 200 pounds, and was an

intimidating man. VIII RR 168. Brian also drank too much and would dabble in drugs some. VIII RR 168. Hoofnel wrote to the district attorney's office, "I rarely saw a man who being such a large man, it can be scary when he was mad." VIII RR 168.

There was another side to Brian that Hoofnel did not know. Hoofnel never heard the decedent belittle Appellant. VIII RR 169. He never heard Brian call her a "dumb ass" or call her a "jelly feeling fat ass". VIII RR 169. Hoofnel knew Brian was on probation for a family violence charge, but he heard the Brian's version of the events and gathered that it was Trichele's fault. VIII RR 170.

Raquel Hoofnel, Danny Hoofnel's wife, had a conversation over text message with Appellant the day Brian Allen died. VIII RR 188-89. At 8:07 p.m., Appellant wrote to Ms. Hoofnel, "Brian's still, still being a mean dick to me. I doubt we make it throughthe long haul. I'm nasty sick of his mean mouth." VIII RR 191. Appellant also told her about a friend of Brian's who came to the house, and she referenced that the friend's penis. VIII RR 191-92. Ms. Hoofnel recounted various times where Appelllant would belittle Mr. Allen for having a small penis only when she had been drinking. VIII RR 194. Regarding Appellant's arrest in San Antonio, she told Ms. Hoofnel Brian had her claim ownership of the contraband because it did not belong to him. VIII RR 201.

On that topic, George Morales, an officer with the San Antonio police

department, responded to the Allen's hotel room after they received several complaints of loud noises and arguing, including what sounded like somebody being thrown around. VIII RR 204. While in the hallway, Morales could smell marijuana, and when Brian opened the door, the smell became stronger. VIII RR 206-07. There were no signs of a disturbance of fight. VIII RR 207-08. While looking around, Morales saw marijuana in plain view on the desk. VIII RR 208. When she came out, Trichele said the marijuana belonged to her, and Brian did nothing that prompted her to say so. VIII RR 209. Morales saw no signs of violence or obvious trauma and there had only been arguing in the room. VIII RR 211. Throughout, Trichele was cooperative with the police. VIII RR 222. There was no indication she was intoxicated. VIII RR 223.

A neighbor of the Allen household, Michael McLemore, recounted that on the evening of the shooting, he talked with Trichele who had a male friend with her just before dark, said she went to San Antonio for Brian's birthday, and they had a good time. IX RR 226-27. They talked for about 30 or 45 minutes and Trichele drank a total of three beers over that time. IX RR 228-29. The two left and went to another residence located on the Allen property occupied by someone named "Shorty". IX RR 231. About 10 minutes later, Brian went over to Shorty's. IX RR 231. Sometime after that, McLemore saw red lights come down the county road toward the Allen household. IX RR 232. He estimated about an hour passed from

the time he saw Brian go toward Shorty's. IX RR 235.

Jo Lee Marshall was best friends with Trichele. X RR 76. Their sons were very close friends. X RR 79. By day of her testimony in court, her entire belief of how violent Brian was changed. X RR 135. On July 1, 2013, she and Trichele were communicating through text messages. X RR 85, *et seq.* She was going to the Allen house that afternoon and started the communication by saying she wanted to buy some marijuana. X RR 85. Trichele said hers was taken in San Antonio, she was arrested, and she took the blame so Brian could get her out of jail. X RR 86. Marshall got to the Allen house sometime after 2:30, got in the pool with her grandson, and chatted with Trichele. X RR 95. Neither had anything alcoholic to drink. X RR 95. Brian came home around 4 or 5 pm and did not appear angry but Marshall knew he was irritated because of Trichele's arrest over the weekend. X RR 96-97.

After opening a beer, Brian said to Marshall, "Perhaps we need to quit drinking; perhaps alcohol is the problem." X RR 99. Trichele was present and asked, "Are we going to quit drinking or is it just me?" X RR 100. They exchanged some tense words, and then Trichele stormed off to her room. X RR 103. Arguing around Marshall was common, but Trichele and Brian kept their tone down after she expressed concern about her grandson. X RR 104. After Trichele went to her room, Marshall talked with Brian who expressed frustration and appeared upset

23

about his relationship. X RR 106-07.

Marshall then went to talk with Trichele in her bedroom before leaving. X RR 107. She told Trichele she could stay at her house if she needed to. X RR 108. She offered it to help calm down any fighting. X RR 109. And though she never saw any physical assaults, she saw a lot of arguing. X RR 109. Marshall knew Trichele to both hate and love Brian. X RR 109.

She was told of a time Trichele stabbed Brian with a wine glass. X RR 113. She came over to the house and saw Brian cut several times over his body. X RR 113. She performed some first aid and against her advice, Brian did not go get stitches. X RR 114. Trichele told Marshall that Brian came at her so she stabbed him. X RR 116.

Marshall saw another incident of violence between the two in 2011. X RR 123. She was at the Allen house with her daughter when they tried to leave with Trichele, but Brian did not want her to drive while intoxicated. X RR 124. Trichele was shifting the car into drive and reverse and back again, moving it back and forth while Brian was in front of it. X RR 124-25. He was trying to avoid the car but still prevent her from driving. X RR 124-25.

She later wrote a statement in which she said, ".. [W]hen Brian was violent, drunk, and angry, someone was going to get hit by Brian." X RR 126-27. She also said in her statement that Brian was a boy who hit girls. X RR 128. At the time of

her testimony, however, she changed her belief. X RR 128. This was despite her having to tell him that boys don't hit girls about three or four times. X RR 128. Marshall had to go to Brian and tell him "You've got to quit hitting Trichele." X RR 139. When Marshall confronted Brian about hitting Trichele, he never denied it. X RR 145-46. She told the police that early in their relationship, Brian hit Trichele often. X RR 139. Marshall went on to tell Brian that when he attacks her she is fighting a "Sasquatch" because he is such a big man. X RR 147. She told him, "You're fighting a Sasquatch that just might kill her this time." X RR 147. She though it possible when Brian said he would kill Trichele and put her in a slab where no one would find her. X RR 152-53.

As to the wine glass, Marshall believed the two were fighting when Brian shoved her which broke the wine glass. X RR 141. The glass was in her hand when he came at her again. X RR 141-42. When she and Trichele's children got to the house, Trichele was up hiding in the attic. X RR 143. The boys then snuck Trichele out, and they stayed with Marshall that night. X RR 143-44.

Jessica Marshall, Jo Lee's daughter, was closer to Trichele than Brian. X RR 167-68. Trichele told her several times about physical abuse by Brian. X RR 168. Trichele's son, Hunter, also sought refuge at the Marshall house at times. X RR 168. Jessica hid in the floorboard of the vehicle Trichele was in trying to leave the house back in 2011. X RR 169. Brian came out and was trying to prevent her from

25

leaving in the car. X RR 169. Trichele shifted into drive and reverse several times and at some point stopped working. X RR 170-71.

Kelli Lorenz became friends with the Allens, and Lorenz was paid to clean their house occasionally. XI RR 131. She cleaned their house the Saturday before Brian died. XI RR 131. While doing so, she placed the long weapon in the bathtub. XI RR 131. She also placed the drum with rounds in it next to the weapon. XI RR 132. On that Saturday, the gun safe was closed, and she had no access to it. XI RR 133. Lorenz saw the Allens almost everyday. XI RR 133. She knew Trichele to work for Metalworkz going proposals and going to jobs with Brian. XI RR 167-68.

Lorenz saw Brian pull Trichele's hair once and saw other makings on Trichele's body. XI RR 135. Six months after the Allens moved into their house, she saw Brian shake Trichele back and forth violently by her hair. XI RR 157. The two appeared irritated with each other that day. XI RR 158. They had been drinking and his mood would change. XI RR 159-60. Lorenz saw that Trichele would have bumps on her head and clumps of hair missing at times. XI RR 162. She knew Trichele to keep a safe with money and notebook of drawings after the two would fight. XI RR 136. The drawings depicted illustrations of fights between the two. XI RR 170. She also witnessed a time when Brian struck Hunter because the two were arguing and Brian was drunk. XI RR 136.

Lorenz and Trichele communicated the day of the shooting through text

26

messaging. XI RR 145, *et seq*. Trichele told her she wished they would get a divorce and just move on. XI RR 149. Trichele joked for Gary Holland to dig a hole for Brian. XI RR 150. She then joked that she could saw Brian up instead. XI RR 150. She then texted that she would need concrete, that she would build a pig pen over it so, "he can get shit on for the rest of eternity just like he shits on me." XI RR 150. She then said she would cover him in molasses and feed him to hogs and laugh all the way to the bank. XI RR 150. Lorenz did not take the contents of the texts as being serious. XI RR 165-66.

Trichele and Brian also texted with each other on July 1. XII RR 85. All-in-all, the conversation read in the text messages appeared more congenial than Trichele otherwise indicated. XII RR 86-89. However, the tone turned angry as the conversation continued. XII RR 90-91, 96-97, 100-01. Brian, however, became nice again once Trichele referenced getting a divorce attorney. XII RR 108-09.

Troy Crumley is a welder and worked from Brian for about three months in the past. X RR 173. He kept a drag racing boat at the Allen's house because Trichele was going to help paint it. X RR 176. He went to get in on July 1. X RR 179. Ronnie Sethman was there, as was Brian. X RR 179. Crumley was under the impression Brian did not want Sethmen there. X RR 179. Before he left, he saw Trichele walk out of the horse barn followed by Sethmen a few moments later. X RR 180. He last saw Brian around 8 pm, and he did not seem intoxicated. X RR

27

184.

Ronnie Sethman knew Brian for about eight years, and helped him with some steel buildings. X RR 189; 188. He went to the Allen's house on July 1, 2013 a little after 7 p.m. for a social visit. X RR 190-91. He met with Brian for about 20 or 30 minutes when Brian said he needed to go do some work. X RR 198-99. Sethmen then went to visit with Trichele at the horse barn. X RR 200-01. They then left the area of the barn, went to feed fish in the pond, then went on to another residence on the property, inhabited by Brian's father. X RR 202-08. About 9 pm, they ran into Brian who asked Sethmen to tell Trichele he was going to buy some marijuana. X RR 212-13. Sethman and Trichele rode the ATV for a while then went into the house. X RR 215-17. By then time they got to the house, Brian's truck was back. X RR 217. In the entryway of the house, Sethman and Trichele became physically intimate. X RR 221. They went to her bedroom and continued. X RR 222.

After leaving the bedroom, they got back on the ATV and rode around in the pasture, eventually having sex on the ATV. X RR 224. Sethman then went back to his pickup after chatting some more when Brian came up to his window and reminded him about a 4th of July party. X RR 227-28. Brian did not appear drunk when Sethman last saw him. X RR 233.

Robert Espinoza also lived on the Allen property in an RV he moved there.

X RR 235. Brian told Espinoza he was going to divorce Trichele and just give her half the company. X RR 239. That conversation was right around 10 pm. X RR 240.

Justin Hargus went to the Allen's house with his girlfriend Dawn Flores that night to deliver a quarter ounce of marijuana. X RR 247; XI RR 9-10. When they arrived, they saw the lights were off in the house, and Brian's truck was not parked where he usually parked it. XI RR 15-16. Hargus called Brian twice but did not get an answer. X RR 256. He then went into the house and was calling out but there was no answer. X RR 260-61. He went in and found Brian lying on his side and saw blood. X RR 264. He ran out and told his girlfriend to call the police because Brian was dead. X RR 265. When she called, the 911 said that someone had already called. X RR 268.

Hargus walked back up to the house and ran into Trichele. X RR 269. Her first words were, "I killed him." X RR 269. He stayed there until 5:30 a.m. X RR 273.

Burnet County 911received an emergency call on July 1, 2013 around 10:30 pm. VIII RR 33-34. The caller stated a man was shot in the lung. VII RR 44. The caller asked for help 14 or 15 times. VIII RR 45. She also said "I knew this could happen with him beating my ass." VIII RR 46. She also said "I hate you so much, Brian. You're dying on me. You're so fucking mean." VIII RR 54. Trichele

29

appeared to try to give CPR to the deceased. VIII RR 55-59.

Alan Whited with Burnet County EMS drove out to the house. XI RR 190. When EMS arrived, they did not move the body away from the scene because they have been trained not to do so. XI RR 196. Hargus, however, told authorities he believed EMTs move Brian's body to a stretcher then back onto the floor. X RR 278. Hargus heard officers telling EMTs that they should not have moved the body. X RR 282-83.

EMTs performed various techniques trying to resuscitate Brian. XI RR 196-97. Whited saw Brian lying on his right side and in the doorway. XI RR 200. His upper half in the bedroom and lower in the bathroom. XI RR 200. He saw one shell casing 10 to 12 inches from Brian's head. XI RR 201. He noticed several other shell casings and bullets on the bathroom floor by his feet. XI RR 209. Whited heard Trichele say that Brian was egging her on and at some point she got the gun. XI RR 205-06. She then said she shot to one side, then another when Brian turned around and told her she wasn't woman enough to do it. XI RR 206. After he turned, she shot him again. XI RR 206, 224. He didn't notice any smell of alcohol coming from Trichele. XI RR 226.

Travis Havmann also responded with Whited. XI RR 228, *et seq*. He didn't remember exactly how Trichele said the shooting happened. XI RR 232. He did, however, remember her saying Brian standing in front of her saying that she was

not women enough to shoot him. XI RR 233. She then shot over his left shoulder one time. XI RR 233. Brian replied again she wasn't women enough to shoot. XI RR 233. Havmann then recounted Trichele saying she did not remember what happened after that. XI RR 233.

Steve Koenning arrived on scene, encountered Trichele and asked her where the gun was. XI RR 44. She appeared very upset, said she didn't know, and just threw it somewhere. XI RR 44. She was crying, shouting, and was difficult to understand. XI RR 44-45. She had blood on her hands, shit, shorts, and her face. XI RR 49, 83-84. She tried to do something with the body, but no one asked her what. XI RR 84. No guns were found around Brain's body. XI RR 45. When he asked what happened, Trichele responded that Brian was trying to help her so she took the gun and shot him. XI RR 47. She also said, "He came at me and I fought him. I didn't know what to do." XI RR 50. She asked whether he was dead. XI RR 50.

Trichele further demonstrated confusion when she then told Koenning that Brian was worked up, was with "us", and then went to go find a gun. XI RR 61-62. She continued, to say nobody was threatening anybody and then Brian asked if she wanted to shoot him and put a gun in her hand. XI RR 62; XI RR 72. She then said she shot several times and hit him with the third. XI RR 62. She later said she hit him with the fourth shot. XI RR 64. At some point later she said she shot ten times.

XI RR 69. But she also said it happened outside. XI RR 69. Trichele also showed confusion by describing three different locations where the shooting occurred. XI RR 67.

She later claimed Brian told her to shoot him. XI RR 71. She went on to say Brian said "Oh, you missed. Shoot me again." XI RR 71. In this version she replied, "Leave me the eff alone." XI RR 72. To which he replied, "Missed me, missed me. You can't hit this big target?" XI RR 72. She shot again. XI RR 72. Brian then fell down. XI RR 72.

During the conversation, she said the two were going to a counseling and she said "I didn't want to shoot him. I never meant to kill him." XI RR 86-87. Trichele told Koenning that Brian choked her, threw her in the bathroom, and locked the door when they were in San Antonio. XI RR 75. He threatened her if she did not take responsibility for the marijuana possession. XI RR 75. She also rambled that Brian was mean to her, had put her in the hospital, and beaten her to a bloody pulp. XI RR 91.

Toward the end of their conversation, Trichele's demeanor became erratic, going from crying, to calm, and to angry. XI RR 76. She continued to make statements that Brian was mean, she was going to divorce, and that she hated him. XI RR 76.

In another contradiction, she said Brian brought the gun, she got it away

from him, and then she shot him on the porch three times. XI RR 77-78. "I got the gun. He was still coming at me, and I didn't want to shoot him. It's homicide when …." XI RR 78. She later said she threw the gun in the yard, but she may have thrown it in the bathtub. XI RR 95.

Trichele recounted impossible events: that the shooting happened on the porch. XI RR 85. She also said they had gone to dinner with several people, waiting all night for Gary Holland. XI RR 88-89. She said Gary Holland was a witness to everything Brian does. XI RR 89.

She also said Brian was in Leander, and he just never got back. XI RR 90. She went on to say she doesn't remember whether she was inside. XI RR 93. When asked, she said the shooting was not inside the house. XI RR 93. Further confusion was shown when she talked about being at the rodeo with friends and that Brian took his work truck, probably went to Copperas Cove or to stay with his mother in Waco. XI RR 93-94. She asked Koenning if he was an officer. XI RR 96. She followed up by asking if he had any marijuana and if he had any movies to watch. XI RR 96.

Robert Clark was on patrol that night and went to the house. XI RR 107. He found a semiautomatic pistol with a magazine still in the gun and the hammer cocked. XI RR 116-17. There was a bullet in the chamber. XI RR 117. He also found several other guns scattered about the scene. XI RR 126. One gun was found

in the bathtub, with a drum unloaded and pen put in it. XI RR 127. But he did not clear it nor know who did. XI RR 127. He also found five pipes on a nightstand and a kit with narcotic paraphernalia in it. XI RR 123-24. Along with those items was an electronic cigarette. XI RR 124.

Trichele was interviewed by Kathy Sievers, an investigator with the Burnet County Sheriff, where she gave a rambling account of the events leading up to the shooting and the shooting itself. *See* State's Exh. 283, 284; XII RR 42, *et seq*. Trichele was consistent about Brian being mean when he would drink whiskey, and she repeated that several times in her interview. XII RR 60. She also repeated that he would be violent and call her many vulgar names. XII RR 61. She expressed more confusion about being on the porch when everything happened. XII RR 62. She also referred to Brian being in Leander with some girls while she was being interviewed. XII RR 62, 64. Trichele also said Brian drove her to the police station. XII RR 64. Throughout the interview, Sievers had to work to keep Trichele on topic. XII RR 63.

Trichele was consistent, however, that Brian was violent, he was coming at her and she shot twice to the sides of him. XII RR 67. When he wouldn't stop, she shot again. XII RR 75.

Sievers also noted that there was blood spattered on the mirror in the bathroom and a bullet below the mirror. XI RR 84. She concluded Trichele was

34

firing from the bathroom toward the bedroom. XI RR 84.

The autopsy of Brian Allen's body was performed by Dr. Satish Chundru of the Travis County Medical Examiner's Office. Brian Allen was 6 foot 3 inches in height and weighed 280 pounds. IX RR 32. He found no soot or stippling from a firearm, which indicates the shot would have been fired from at least about 24 inches away. IX RR 35. He also recovered one complete bullet, though deformed, in addition to a fragment of another bullet. IX RR 35. One gunshot wound was located on the midback toward the left side, and that bullet entered, went through the vertebral column then through the heart. IX RR 36. It continued through his heart, struck the sternum and ceased moving. IX RR 36. Because the wound severed his spine, the shot would have dropped Brian Allen and been fatal by itself. IX RR 36-37. There was a second wound described as "fairly superficial" which went into the left side of Brian's back, only going through underlying fat in the back, and exiting the back. IX RR 37. After that, it went into his arm and left through the shoulder. IX RR 37. The general trajectory of the bullets were each left to right, back to front and upwards. IX RR 38. Ultimately, Dr. Chundru concluded Brian died of homicide caused by gunshot wounds. IX RR 39. However, he could not conclude which gunshot occurred first. IX RR 70. Nor could he determine how rapidly the two shots happened. IX RR 71. Dr. Chundru estimated it would take mere seconds to minutes for Brian to die, given the injury. IX RR 61.

As part of the autopsy, Dr. Chundru looks for defensive wounds which could indicate a struggle in which the person sought to defend himself. IX RR 42-43. With Brian's body, Dr. Chundru found small abrasions that could have been caused by anything, even falling down in addition to other more recent wounds that were not likely caused by striking something. IX RR 43. Brian was also found with superficial cuts or abrasions in some pattern on the back of his neck. IX RR 51. However, the absence of wounds on his hands does not mean there was no violence committed by the decedent, such as pulling hair. IX RR 69. A blood sample was also taken from Brian and tested; it showed a .16 blood alcohol concentration. IX RR 58-59. In addition, he had marijuana in his system. IX RR 65.

The results of forensic testing of Trichele's blood showed an alcohol concentration of 0.79 grams per 100 milliliters and also of 0.045 milligrams of alprazolam per liter of blood which it within therapeutic levels. IX RR 78.

Ronald Crumley, a firearms section supervisor with the Department of Public Safety Crime Lab in Austin, assisted in the collection of evidence. IX RR 103; IX RR 104-05. Several .45 caliber cartridges were found, two in the bedroom next to the bathroom, one in the closet next to the bathroom, and several in the bathroom itself. IX RR 126-39. An H&K brand pistol was found to the right side of the bathtub, along with a magazine for the pistol. IX RR 132. Brian's favorite pistol was the .45 which he kept in his bedside table. XIII RR 174. A total of 43

unfired .380 cartridges were also found in the bathroom on the floor and in a duffel bag in the bathroom, but they do not fit the recovered H&K pistol. IX RR 133; IX RR 161-62. No .380 cartridges were fired. IX RR 134. A gun cabinet inside the closet was open and one gun was found partially in the safe. IX RR 145-46. There were many guns inside the safe. IX RR 146. That gun appeared to be a kind of assault rifle called an AR-15. IX RR 188. Other guns were found behind the closet door and one on some clothing in the closet laying down. IX RR 187.

Six .45 caliber cartridges were recovered and all seven tested as being fired from the recovered H&K pistol. IX RR 166. The seventh bullet was unable to be found until much later. IX RR 166-67. Testing showed the seventh bullet as having been fired from the same pistol. IX RR 167.

Crumley also tested for gunshot residue on Brian's clothing and determined the shots fired would have been from more than 2 feet away. IX RR 182. Brian's body was found in the entryway between the bathroom and bedroom. IX RR 191-92. And his body was mere feet from the shotgun located in the bathtub. IX RR 193.

Troy Wilson of the Texas Rangers, scanned the room with an electronic device, produced a three dimensional model of the scene, and also reviewed photographs taken the night of the shooting. XIII RR 13, *et seq*. Based on the information recovered, he opined the majority of the shots fired were from within

the bathroom. XIII RR 54. Seven shots were fired, but only five bullet holes were found in the house. XIII RR 69. Of those bullet holes, trajectories could only be determined for two. XIII RR 69. There was also a possibility one of the shots could have come from the bedroom. XIII RR 84. However, in order to determine the position of Brian at the time of the shooting Wilson would need more information that what was available. XIII RR 62. Wilson could determine the shooting started in the direction of the closet, where several other firearms were to be found, across the bathroom, and then to the door threshold into the bedroom where Brian was found. XIII RR 62-63.

Wilson also testified that going through a sleep cycle after a shooting helps improve the memory of the shooter so they can better explain and provide a statement. XIII RR 75.

Another Ranger, Richard Henderson, reached the same conclusion about the shooting. XIII RR 127. He believed Brian was probably in the closet, then ran through the bathroom and into the bedroom and was shot before leaving the bathroom. XIII RR 127. Henderson couldn't determine if the shots were fired by more than one person or when they were fired. XIII RR 133. It was also elicited that it would be more likely for a person to grab their own gun if he planned on shooting someone rather than grabbing someone else's gun. XIII RR 141.

Brian owned about 10 guns, some in his office in the house, as well as other

places. VIII RR 106-07. Kevin Allen went to the house after the shooting, found a weapon with a loaded magazine and brought it to authorities because they did not believe police had retrieved the murder. Weapon. X RR 67-68; *see also* X RR 19.

The jury returned a verdict of guilty and then rejected the sudden passion issue, choosing to sentence Appellant to life in prison. CR 88, 97-98. The trial court imposed the sentence. CR 99-100 This appeal follows.

## SUMMARY OF THE ARGUMENT

This case is about self-defense and whether it was immediately necessary. Much of the evidence focused on that issue, and both parties focused much of their arguments on it. The error in this case mandates reversal for four reasons. First, the instructions are incorrect in their statement on the law of self-defense. They wholly omit the statutory scheme on the law on self-defense. As to the law of deadly force, the jury instructions wholly omit the second element, which is a mandatory provision. Second, the instructions include a charge on self-defense in response to verbal provocation. This extra language is nowhere to the found in the penal code. Next, the instructions fail to include the law on the presumption of reasonableness, which applies to the facts of this case. Finally, the cumulative effect of these errors in the jury instructions have resulted in a constitutional due process violation.

The matter should be reversed for a new trial because of the erroneous instructions resulted in egregious harm to Appellant. An analysis of the four *Almanza* factors will be examined and demonstrate the actual, egregious harm suffered. As to the final issue, the matter should be reversed because the due process deprivation is an error of constitutional magnitude and cannot be said the error did not contribute to the conviction, beyond a reasonable doubt.

The three issues raise concerning individual jury instruction error will be addressed in this brief in the first section because they are closely related. The

cumulative due process matter will be briefed in a second, separate argument.

## Argument on Issues I, II, and III

## Issues.

**I.     Appellant suffered egregious harm because the jury instructions omitted the presumption of reasonableness that the use of deadly force was immediately necessary.**

**II.     Appellant suffered egregious harm because jury instructions on the law of self-defense omitted a significant portion of the law on use of deadly force in self-defense.**

**III.     Appellant suffered egregious harm because the jury instructions included extra-statutory language regarding self-defense in response to verbal provocation not permitted by the penal code.**

## Standard of Review

When reviewing charge error, the reviewing court will consider two questions: (1) whether error existed in the charge and (2) whether sufficient harm resulted from the error so as to compel reversal. *Ngo v. State*, 175 S.W.3d 738, 744 (Tex. Crim. App. 2005). Charge error is egregiously harmful if it affects the very basis of the case, deprives the defendant of a valuable right, or vitally affects a defensive theory. *Villareal v. State*, 453 S.W.3d 429, 433 (Tex. Crim. App. 2015). A reviewing court will not reverse a conviction unless the defendant has suffered

actual and not theoretical harm. *Cosia v. State*, 353 S.W.3d 766, 777 (Tex. Crim. App. 2011). In conducting this review, the actual degree of harm must be assayed in light of (1) the entre jury charges, (2) the state of the evidence, including the contested matters and the strength of the probative evidence, (3) the argument of counsel, and (4) any other relevant information shown in the record of the trial as a whole. *Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1984).

**Law Applicable**

The Texas Penal Code provides that use of force in self-defense is a justification to criminal conduct if the defendant reasonably believes it is immediately necessary to protect herself against another's use or attempted use of unlawful force. TEX. PEN. CODE § 9.31(a) (West 2013).

The use of force is presumed reasonable if the defendant (1) knew or had reason to believe the person against whom the force was used was committing or attempting to commit aggravated kidnapping, murder, sexual assault, aggravated sexual assault, robbery, or aggravated robbery, (2) did not provoke the person against whom the force was used, and (3) was not otherwise engaged in criminal activity. TEX. PEN. CODE § 9.31(a) (West 2013).

The same applies to use of deadly force in self-defense: A person can use deadly force against another (1) if she would be justified in using force against the other under [the self-defense provision above]; and (2) when and to the degree she

reasonably believes the deadly force is immediately necessary (A) to protect herself against another's use or attempted use of unlawful deadly force, or (B) to prevent the other's imminent commission of aggravated kidnapping, murder, sexual assault, aggravated sexual assault, robbery, or aggravated robbery. TEX. PEN. CODE § 9.32(a) (West 2013).

Similarly, a person's use of deadly force is presumed reasonable if she knew or had reason to believe that the person she used deadly force against was committing or attempting to commit aggravated kidnapping, murder, sexual assault, aggravated sexual assault, robbery, or aggravated robbery. TEX. PEN. CODE § 9.32(b) (West 2013). The presumption also requires that the actor not have provoked the other and that the actor was not otherwise engaged in criminal activity. TEX. PEN. CODE § 9.32(b)(2) and (3) (West 2013).

When a penal code provision establishes a presumption in favor of the defendant the court must charge the existence of the presumed fact to the jury if there is sufficient evidence of those facts, unless the court concludes the evidence, as a whole, precludes a finding beyond a reasonable doubt of the presumed fact. TEX. PEN. CODE § 2.95(b)(1) (West 2013). The charge to the jury of the presumed fact must include language which states "(A) the presumption applies unless the state proved beyond a reasonable doubt that the facts giving rise to the presumption do not exist; (B) if the state fails to prove beyond a reasonable doubt that the facts

44

giving rise to the presumption do not exist, the jury must find that the presumed fact exists; (C) even though the jury may find that the presumed fact does not exist, the state must provide beyond a reasonable doubt each of the elements of the offense charged; and (D) if the jury has a reasonable doubt as to whether the presumed fact exists, the presumption applies and the jury must consider the presumed fact to exist." TEX. PEN. CODE § 2.05(b)(2) (West 2013).

Unobjected to error in the court's instructions to the jury mandates reversal when the error is so egregious and created such harm that the accused is deprived of the right to a fair and impartial trial. *Almanza v. State*, 686 S.W.2d 157, 171-72 (Tex. Crim. App. 1985); TEX. CODE CRIM. PROC. art. 36.19 (West 2013). Errors which result in egregious harm include those that affect the very basis of the case, take a valuable right from the accused, vitally affect a defense theory, or make the case the case for conviction or punishment clearly and significantly more persuasive. *Almanza*, 686 S.W.2d at 171-72; *McIntosh v. State*, 297 S.W.3d 536, 542-43 (Tex.App.—Houston [1st Dist.] 2009, pet. ref'd).

Article 36.14 requires the trial judge to deliver a written charge "distinctly setting forth the law applicable to the case" to the jury. TEX. CODE CRIM. PROC. art. 36.14 (West 2013).

The trial judge has an obligation to instruct the jury on the law applicable to the case, even when the defense counsel does not voice an objection to inclusions

or exclusions in the jury instructions. *Vega v. State*, 394 S.W.3d 514, 519 (Tex. Crim. App. 2013). A defendant turned appellant cannot complain on appeal about the trial court's failure to include a defense instruction that he did not preserve at the charge conference. *Id*. However, when a trial charges on a incorrectly on a defensive issue, whether on request or *sua sponte*, the error is subject to review under *Almanza*. *Id*.

The trial court must give a requested instruction on every defensive issue raised by the evidence. *Dugar v. State*, 464 S.W.3d 811, 816 (Tex.App.—Houston [14th Dist] 2015, pet. ref'd). If some evidence on each element of a defense is raised, if believed by the jury, would support a rational inference of the element is true, a defensive issue is raised. *Id*.

Neither the defense, nor the State are entitled to a special jury instruction relating to a statutory offense or defense if the instruction (1) is not grounded in the Penal Code, (2) is covered by the general charge to the jury, and (3) focuses the jury's attention on a specific type of evidence that may support an element of an offense or a defense. *Walters v. State*, 247 S.W.3d 204, 212 (Tex. Crim. App. 2007) (reh'g denied). Under those circumstances, the non-statutory instruction would constitute a prohibited comment on the weight of the evidence. *Id*.

The code of criminal procedure also requires the trial court, in the charge, not to express "any opinion as to the weight of the evidence". TEX. CODE CRIM.

PROC. art 36.14 (West 2013).

An incomplete or erroneous jury charge jeopardizes the accused's fundamental right to a jury trial because the jury is not properly guided in its fact-finding function by the jury charge. *Abdnor v. State*, 871 S.W.2d 726, 731 (Tex. Crim. App. 1994).

**Analysis of Issues I and II**

The issues raised in this brief concerning the charge were not objected to at the trial court. Accordingly, this brief will show the error resulted in egregious harm. Indeed, error in the charge is egregiously harmful because the omitted self-defense instructions affected the very basis of the case, deprived the defendant of the valuable right to the defensive issue, and vitally affected the sole defensive issue in the case.

Issues I and II focus on the omission of jury instructions. Issue I explores whether the omission of the presumption of reasonableness is egregiously harmful. Issue II asks the same question about the omission of large portions of the statutory language on self-defense and deadly force, respectively. This argument first begins with inquiring whether there was error in the charge then goes on to an analysis of the four *Almanza* factors listed above as applied to Issues I and II.

A.    Is there Error?

The matter of self-defense was raised by the evidence, unquestionably. Dr.

Busch raised it by way of testimony along with various other fact witnesses who testified that the decedent kept coming at Appellant after she fired shots at him. The question of whether shooting was done in self-defense is an issue for the jury.

Indeed, the matter was charged, albeit incompletely. Because the matter was raised by the evidence, Appellant was entitled to have the jury instructed on the law concerning self-defense. *See* TEX. CODE CRIM. PROC. art. 36.14 (West 2013); *Dugar v. State*, 464 S.W.3d at 816.

B. *Almanza* Factors

1. *The Entirety of the Jury Charge*

The jury charge at issue include only brief instructions on self-defense and on deadly force. *See* CR 84-86. Additionally, it included no provision regarding the presumption of reasonableness in use of deadly force provisions of the penal code. TEX. PEN. CODE § 9.32(b) (West 2013). The complete omission of the presumption weighs in favor of finding egregious harm. *See Villareal v. State*, 453 S.W.3d at 433.

The abstract portion of the jury charge only included three sentences on self-defense. The first stated that a person is justified in using deadly force is she reasonably believed the deadly force was immediately necessary to protect the person against the other's use or attempted use of unlawful deadly force. The second sentence read, "Self-defense does not cover conduct in response to deadly

force in response to verbal provocation alone." CR 84. It added a sentence which is not authorized by the penal code provisions on self-defense. *See* TEX. PEN. CODE § 9.31 and 9.32 (West 2013).

The application paragraph correctly states the necessary elements for the offense and went on to charge on self-defense. It reads,

> "To decide the issue of self-defense, you must determine whether the state has proved, beyond a reasonable doubt, one of the following:
>
> "1.    The defendant did not believe her use of deadly force was immediately necessary to protect herself against Brian Allen's use or attempted use of unlawful deadly force; or
>
> "2.    The defendant's belief was not reasonable.
>
> "You must all agree that the state has proved, beyond a reasonable doubt, either element 1 or 2 listed above. You need not agree on which of these elements the state has proved.…
>
> "In determining the issue of self-defense it is your duty to consider all relevant facts and circumstances surrounding the alleged offense and the previous relationship, if any, existing between Karra Trichele Allen and Brian Allen, the words, including acts and conduct of the said Brian Allen together with all relevant facts and circumstances going to show the condition of the mind of Karra Trichele Allen at the time of the alleged offense."

CR 85-86.

The charge then includes a second application paragraph which correctly lists the elements for the offense and is followed with "… BUT if you further find from the evidence, or have a reasonable doubt thereof, as viewed from the

Defendant's standpoint alone, that the Defendant reasonably believed that deadly force when and to the degree used, if it was, was immediately necessary to protect herself against the use or attempted use of unlawful deadly force, either real or apparent, by the said Brian Allen, you will acquit the Defendant of the offense of MURDER and say by your verdict 'Not Guilty'." CR 86.

The self-defense abstract instructions are woefully incomplete. They do not instruct the jury on the law of self-defense under Penal Code § 9.31. More troubling is that the instructions incorrectly state the law on use of deadly force. *See* TEX. PEN. CODE § 9.32(a) (West 2013). The charge shortcuts § 9.31 by going directly into to § 9.32. However, it omits subsection (a)(2) which has mandatory language. Subsection (a)(2) reads,

".. when and to the degree the actor reasonably believes the deadly force is immediately necessary:

(A) To protect the actor against the other's use or attempted use of unlawful deadly force; or

(B) To prevent the other's imminent commission of aggravated kidnapping, murder, sexual assault, aggravated sexual assault, robbery, or aggravated robbery."

TEX. PEN. CODE § 9.32(a)(2) (West 2013).

In no part of the jury charge is this language included. Arguably, subsection (A) is included in the shortened instruction under the self-defense charge. However, the deadly force statute is written with reference to the self-defense

50

statute first, which includes the use or attempted use of unlawful language. *See* Tex. Pen. Code § 9.31(a) (West 2013). Similar language is repeated in the deadly force statute with the inclusion of the word "deadly" in place of "unlawful". *See* Tex. Pen. Code § 9.32(a)(2) (West 2013). The plain language of the statutes demonstrate the legislature must have intended all language be included. Its exclusion cannot be permissible.

But the charge does not ask the jury to decide whether, in light of the circumstances of the case, Appellant was entitled to the presumption of reasonableness as to her belief the use of deadly force was immediately necessary. Tex. Pen. Code § 9.32(b) (West 2013). The instruction, had it been included, would have required the jury to apply the presumption unless the State proved, beyond a reasonable doubt, Appellant knew or had reason to believe Brian Allen (1) was committing or attempting to commit aggravated kidnapping, murder, sexual assault, aggravated sexual assault, robbery, or aggravated robbery, or (2) Appellant provoked Brian Allen. *See* Tex. Pen. Code § 9.32(b)(1)(B) and (b)(2) (West 2013). The complete instruction shows the State bears the burden of proving the presumption does not apply. Only if the State so proves, beyond a reasonable doubt, could the jury then disregard the presumption.

The entirety of the jury instructions are inadequate to properly charge on self-defense. First because they are incomplete. Large portions of the written

statutes are omitted. Secondly, the presumption was properly raised by the evidence and omitted from the charge, though the matter was raised by the evidence. This factor weighs heavily for Appellant. The charge runs the risk of misleading the jury in the proper application of self-defense. It also deprives Appellant of the presumption of reasonableness allowed in Texas law.

Following the analytic framework of the Texas Court of Criminal Appeals in *Villareal*, *supra*, this brief will next argue the state of the evidence adduced at trial supports the presumption, and therefore, the omission of the charge deprived appellant of a fair and impartial trial. Note, however, the facts of this case are distinguishable from this in *Villareal*.

2.    *State of the Evidence*

The evidence at trial focused in large part on the history between Appellant and the decedent. Parts were contested whether the decedent was an "abuser", *per se*. However, some evidence was not contested that the decedent had, in fact, previously assaulted Appellant. That lengthy history of abuse led to ultimate conclusion by the defense expert on interpersonal violence that the decedent was an abuser and Appellant was in fear of her life. The omission of the proper instructions on self-defense and the presumption of reasonableness is, accordingly, egregiously harmful.

a.    Witness testimony throughout the lengthy trial showed numerous

instances where Appellant suffered abuse at the hands of the decedent. Broadly speaking, evidence from separate witnesses all showed, the decedent would assault Appellant different ways: He would pull Appellant by the hair, would strike her across the face (at least one time to make her begin to fall out of a chair), would throw rocks her car, would hold her head underwater. The decedent's own words to Robert Henley showed he treated Appellant poorly, had explosive fits of violence and anger, and knew he needed to change his ways.

b.      Appellant's words the night of the shooting are inconsistent, at best. But she was clearly in a state of shock. She had been suffering abuse, had a blood alcohol near the legal limit at the time it was drawn, and had just shot her partner of over a decade. The only consistent statements she made was that the shot one direction, then shot another direct, but decedent kept coming at her, so she shot him again. The State, at trial, seemed to take her statements as made with scientific precision, rather than what they are: The ramblings of a woman who was under the trauma and shock of having shot her husband.

c.      Dr. Busch-Armerendiz examined the offense reports, consulted with Henley, interviewed Appellant, and ultimately rendered an opinion directly on point with the presumption omitted in the charge: Appellant suffered escalating violence for years. Appellant believed she was about to be killed. Her shooting of the decedent was necessary and reasonable from her standpoint because the

accumulation of his attacks over time. The evidence included her conclusion that any ordinary and prudent person in the same circumstances would have believed his or her life was in danger. Indeed, Appellant believed she was about to be murdered.

d.      The evidence of the witness testimony of the history of violence, Dr. Busch's opinion based on information she received, and Appellant's only consistent statement all lead to one conclusion: The statutory presumption of reasonableness is applicable to this case. Indeed, the jury received direct evidence in the form of testimony that a reasonable person would have believed he or she was to be imminently killed.

The instruction should have been included because it was raised by the evidence. The omission of the instruction on the presumption of reasonableness deprived Appellant of a fair trial. Additionally, the state of the evidence clearly demonstrates self-defense was the central theory of the defense. This factor weighs heavily in favor of a finding of egregious harm.

3.      *Argument of Counsel*

Close examination of the arguments of counsel shows that use of deadly force in self-defense was the defensive theory in the case. Additionally, examination of the argument of State's counsel reveals much of their case was to negate the self-defense justification, as is its burden.

In argument, the prosecutor commented that all the relevant facts and circumstances showing the condition of Appellant's mind can be considered. XVII RR 9. Moreover, he rhetorically asked, ".. [D]id she reasonably believe that she had to defend herself against Brian Allen by shooting him?" XVII RR 10. He also argued the defendant had to reasonably believe the "deadly force was immediately necessary, not in an hour, not in two hours, not the next day, but right then immediately necessary to protect her against the other's use or attempted use of unlawful deadly force." XVII RR 10. He followed up by noting, ".. [I]f Brian Allen was attacking her with deadly force unjustly, it would be unlawful and she could use deadly force to protect herself." XVII RR 10. The state argued more than verbal provocation along was necessary to justify the act. XVII RR 11.

The state argued at length about reasonable belief:

".. [A] reasonable belief means a belief that is ordinary…. What's an ordinary prudent person? … What's the reasonable thing to do?

"A belief that's held by an ordinary, prudent person would have held in the same circumstances as the defendant. Now, this does not mean necessarily what would Karra Trichele Allen believe, okay? Or what would an angry person believe, or what a woman who hates her husband necessarily believe?

".. [Y]ou take all the circumstances that the defense is trying to show you, you gather that up, and then you kind of have to step out of Karra Trichele's shoes and step into the shoes of an ordinary and reasonable person and go, given those facts and circumstances, if you believe them – let's not forget that, you have to believe them – would an ordinary, prudent person in those circumstances have held those

55

beliefs?" XVII RR 11-12.

The state continued about the reasonable belief, again commenting:

"The State has to prove beyond a reasonable doubt that Karra Trichelle Allen – either Karra Trichele Allen did not believe her use of deadly force immediately necessary to protect herself against Brian Allen's use or attempted use of unlawful deadly force, meaning we have to prove – we, again, can't go into the defendant's mind – but of all the surrounding circumstances that you've heard or that you believe, you can infer whether or not she reasonably believed that the force was immediately necessary.

"Or the State can prove that her use of deadly force was not reasonable. She didn't mean to shoot Brian Allen. Didn't need to do it." XVII RR 13.

"And the fundamental case here is and it just boils down to this: Given what you believe about the relationship between Brian Allen and Karra Trichele Allen, and what you believe happened that night the that house, in that bathroom, did Karra Trichele Allen really have to kill him? Really? Did she have to shoot him in the back twice? I submit the answer is no." XVII RR 14.

Defense argument focused on categories of witnesses. But went on to state ".. 99 percent of this trial was not about the – whatever it was, two minute or 20 minutes that happened in the bedroom. 99 percent of this trial by the State and by the defense, by the State and by the defense, [sic] was about the relationship between Brian and Trichele and the violence that existed." XVII RR 21. Defense counsel also highlighted portions of the charge about the mindset of Appellant: "'In determining the issue of self-defense, it is your duty … to consider all relevant facts and circumstances surrounding the alleged offense in the previous

56

relationship existing between Karra Trichele and Brian Allen…. The words, including acts and conduct of the said Brian Allen, together with all relevant facts and circumstances going to show … that show the condition of the mind of Karra Trichele Allen at the time of the alleged offense.'" XVII RR 27. He further read from the charge:

> "'If you find from the evidence, or if you have a reasonable doubt as to whether self-defense applies as viewed from Karra Trichele Allen's Standpoint alone that the defendant reasonably believed that deadly force when and to the degree used was immediately necessary to protect herself against the use or attempted use of unlawful deadly force, either real or apparent, by the said Brian Allen, then you will acquit her and say by your verdict not guilty.'" XVII RR 27.

Appellant argued that Dr. Busch concluded Brian Allen was an abuser. XVII RR 35. Relying on Dr. Busch's testimony he said that Appellant was in fear of her life. XVII RR 35-36. Counsel later argued, "Brian is whipping up on her during this incident. That's the most logical conclusion. Ask yourself, has the State proven it to me, what happened in that short period of time, that she intentionally and knowingly killed him? Has the State proven to you beyond a reasonable doubt, beyond a reasonable doubt that self-defense does not apply?" XVII RR 38.

In its rebuttal, the State argued that Appellant was angry, not in fear. And that is what murder is about. XVII RR 41-42. The State further said Appellant made no claims of a physical attack during the incident. "The closest thing she said to a physical attack was, 'He was coming at me. Coming at me.' But, you know,

when you listen to that tape and you listen to every statement she made, she never says, 'He was coming at me to hit me. He was coming at me with something in his hand. He said something that scared me.'" XVII RR 50.

The State suggested that Dr. Busch stated "a reasonable person would not have a fear of imminent use of unlawful deadly force if the actor had a gun in their hand and the victim was running away from the actor and not towards any weapons." XVII RR 51. Toward the end, the State said, "We have proved there was no reasonable belief and no use of unlawful deadly force by Brian Allen." XVII RR 66.

Arguments of counsel demonstrate, again, this case was largely about self-defense. Each party also commented on Busch's testimony. Her testimony was central to self-defense and to Appellant's belief she was about to be murdered. With this argument as a backdrop, to provide incomplete instructions on self-defense and to omit a presumption allowed by law is in error and demonstrate this factor weighs heavily in favor of Appellant.

4.    *Entirety of the Record*

The *Villareal* case, *supra*, in part reasoned that the jury there rejected sudden passion so it was unlikely they would have considered the presumption of reasonableness. In anticipation the State will make a similar argument, Appellant would show this court that this case is distinguishable from the reasoning in

*Villareal*.

The State argued the sudden passion was only about what happened immediately at the time of the shooting. Defense counsel argued the jury could consider the history of the relationship between the two.[2] The State read part of the charge at argument and highlighted that sudden passion is "passion directly caused by and arising out of provocation by the individual killed, or another acting with the person killed, which passion arises at the time of the offense and is not solely the result of former provocation." XVIII RR 24. The State also argued,

> "Remember at the guilt/innocence phase of the trial, there was this question of the history between them and what was operating on the defendant's mind at the time that she shot Brian Allen. *That is not a consideration here*. If there is sudden passion in this case, it has to have arisen then at the moment that she shot Brian Allen, not anything that happened two years ago or five years ago of the day before, but right then."

XVIII RR 24-25 (emphasis added).

The prosecution went on to state, "..[S]he had to have acted under [the sudden passion] immediately, under the immediate influence. It has to have happened right then in order for y'all to consider this question of sudden passion." XVIII RR 25. Again they argued in rebuttal, "Was it provoked by the victim at the time of the offense?" XVIII RR 30.

---

[2] On guilt/innocence, a specific instruction is included telling the jury they may consider all circumstances surrounding the incident along with all facts and circumstances showing the condition of the mind of Appellant at the time of the shooting. CR 84. No such charge was provided to the jury on punishment.

It is improper to infer, under the facts this case, that because the jury rejected sudden passion at punishment they would have rejected the presumption of reasonableness at guilt/innocence. As properly argued by the State, the sudden passion question focuses on the time of the incident. Conversely, the defense theory on use of deadly force focused on the history of escalating violence between Appellant and the decedent causing the state of mind of any reasonable person in Appellant's position at the time of the shooting.

The rest of the record, taken as whole, clearly demonstrates the defense at issue was solely that of deadly force used in self-defense. Each part of the defense went to that issue; there was no alternative. The fact witnesses called by Appellant talked about the history of violence and how it didn't stop. Ultimately, the expert provided the direct opinion relied on by the defense. Appellant was deprived of the right to fair trial. This factor, again, weighs in favor of Appellant.

## Conclusion on Issues I and II

The omission of the presumption of reasonableness, in light of the four *Almanza* factors, resulted in egregious harm to Appellant. The charge excluded any reference to the presumption when Appellant was entitled to it. Indeed, it left out crucial parts of the law on self-defense. The state of the evidence showed Appellant was subjected to violence by the decedent for many years. The arguments of counsel focused in large part on self-defense and particularly on "reasonableness".

Finally, merely because the jury rejected sudden passion give no rise to an inference they would have rejected sudden passion, under the defense theory in this case. The entirety of the record, taken as a whole, shows this case was about self-defense.

Accordingly, this matter should be reversed and remanded to the trial court for a new trial because the erroneous omission of the law on the presumption of reasonableness was left out of the instructions to the jury.

Similarly, the instructions in the abstract concerning self-defense and deadly force caused egregious harm. There is no language of self-defense per § 9.31. The deadly force defense incorporated self-defense, and arguably, the charge here makes a short cut and includes the self-defense language in the definition of deadly force. That as it may be, over half the law on deadly force is omitted from the charge. Because the central defensive issue in this case was about the use of deadly force in self-defense, the exclusion of a significant portion of the law on that justification caused egregious harm to Appellant. Accordingly, this matter should be reversed and remanded for a new trial with proper jury instructions on the issue of self-defense and on the issue of deadly force.

**Analysis of Issue III**

As to the third issue, the second paragraph in the jury charge on self-defense reads, "Self-defense does not cover conduct in response to verbal provocation

61

alone. The defendant must have reasonably believed the other person had done more than verbally provoke the defendant." CR 84. Under the Texas Penal Code, the law on provocation in this context is, "The use of force against another is not justified in response to verbal provocation alone." TEX. PEN. CODE § 9.31(b)(1) (West 2013). The only other language on provocation is in the reasonableness presumption, which, as noted above, is wholly omitted from these jury instructions. *See* TEX. PEN. CODE § 9.32(b)(2) (West 2013).

The non-statutory instruction constitutes a prohibited comment on the weight of the evidence. *See Walters v. State*, 247 S.W.3d 204, 212 (Tex. Crim. App. 2007). As stated by *Walters* court, neither party is entitled to any special instruction relating to an offense or defense not grounded in the Penal Code, covered by the general charge to the jury, and which focuses the jury's attention on a specific type of evidence that may support an elements of an offense or a defense. *Id*.

As shown, the extra sentence that the defendant must have believed something more than provocation was done is language not included in the penal code related to self-defense. This extra-statutory language clearly focuses the jury's attention on a specific type of evidence relating to the central defensive theory of the case. Additionally, this extra language is error in the charge and mandates review under *Almanza*. At the risk of being overly brief, because this brief has detailed *Almanza* review for the preceding two issues above, this analysis will be

shorter.

1. *The Entirety of the Charge*

The charge at issue includes only an incomplete set of instructions on self-defense. The language of provocation is included, in additional to the extra-statutory language. The application paragraph also includes a self-defense instruction. Because self-defense is included in the charge, albeit incompletely, it is a known and important issue in the case. To incorrectly instruct the jury on the law is a grievous error. This charge error weighs in favor of Appellant.

2. *State of the Evidence*

Much of the evidence through witness testimony discussed whether Appellant or the decedent would start fights. It discussed who would provoke disagreements. By including the impermissible language, the jury's attention was focused on a specific type of evidence, that of provocation. Because of this impermissible commentary on the evidence, this factor also weighs heavily in Appellant's favor.

3. *Argument of Counsel*

Again, both defense and state counsel argued at length about what reasonable people would do in similar circumstances. And in particular, the State directly spoke with the jury concerning the instruction. XVII RR 10-11. The State also linked the provocation to what Appellant must have reasonably believed. XVII

RR 11. This factor will also weigh in favor of Appellant.

4. *Entirety of the Record*

In anticipation of the State's argument, Appellant reiterates this factor from earlier in this brief. The sudden passion and self-defense issues are separate matters for the jury's consideration. Sudden passion looks at that instant time of the shooting, alone. Self-defense, however, reviews this relationship of over ten years. Additionally, the entirety of the record indicates the State intended to show Appellant was responsible for starting many fights between the two. The defense did not contest that Appellant would start some of those fights. This evidence of provocation is repeated throughout the record. This factor weighs in Appellant's favor.

## Conclusion on Issue III

The extra language, not included anywhere in the penal code, served to focus the jury's attention on a specific type of evidence. Because that type of evidence was the central theory of the defense, was otherwise included in the jury charge, was relied on by counsel in argument, and rendered the trial fundamentally unfair, the error in the charge is egregious under *Almanza* review. Accordingly, like issues I and II, this matter requires this case be reversed and remanded for a new trial.

## Argument on Issue IV

### Issue

**IV. The cumulative effect of the numerous errors in the jury instructions has resulted in a constitutional due process violation because Appellant was denied the right to have a legal defense accurately presented to the jury.**

### Law Applicable

"No citizen of this State shall be deprived of life, liberty, property, privileges or immunities, or in any manner disenfranchised except by the due course of the law of the land." TEX. CONST. art. I § 19.

No person shall be "deprived of life, liberty, or property, without due process of law…". UNITED STATES CONST. Amend. V.

Art. 36.14 requires the court charge the jury on the law applicable to the case. TEX. CODE CRIM. PROC. art 36.14 (West 2013).

The very basis of due process is the have notice of a specific charge, a chance to be heard in a trial of the issues raised by that charge. *Cole v. Arkansas*, 333 U.S. 196, 201 (1948).

"A fundamental error is a very basis, an underlying material error that affects the founding of a conviction's validity. It may well be a violation of fundamental fairness, a violation of due process of law, a violation of the due course of law of the land." *Almanza v. State*, 686 S.W.2d 157, 176 (Tex. Crim. App. 1984) (Onion,

J. concurring in part and dissenting in part) (internal cite omitted).

Even if no individual error is a constitutional deprivation, a number of errors may be found harmful in their cumulative effect. *Chamberlain v. State*, 998 S.W.2d 230, 238 (Tex. Crim. App. 1999).

The existence of multiple errors can warrant reversal when they operate in concert to undermine the fundamental fairness of the proceeding. *Estrada v. State*, 313 S.W.3d 274, 311 (Tex. Crim. App. 2010).

**Analysis**

In addition to the issues cited above regarding specific instances of charge error, in cumulation, the jury instructions' failure to accurately set out the law on self-defense have rendered the trial of Appellant fundamentally unfair. Without so conceding, if any of the individual errors in the jury instructions are found not to be egregiously harmful, the cumulative effect of the errors rises to the level of a constitutional breach.

The fundamental right to have defensive issues presented to the jury in the instructions is so flawed in this case, the error has undermined the basic fairness of the trial. First, the entirety of the statutory scheme law is not set out. (Omission of § 9.31, Texas Penal Code.) Secondly, only half of the deadly force defense is provided in the abstract. (Omission of § 9.31(a)(2), Texas Penal Code.) Next, the legal presumption afforded by the penal code, and applicable to this case, is also

left out of the jury instructions. (Omission of § 9.31(b), Texas Penal Code.) Finally, the jury instructions include extra-statutory language not allowed by law. (Inclusion of extra language regarding provocation in self-defense context.)

This case is about self-defense. The jury instructions erroneously instructed on that issue through the numerous individual errors. Even if each individual error is found not to be egregiously harmful, the cumulative effect of the improper omission or inclusion of jury instructions runs afoul of due process.

Accordingly, the record here shows constitutional error. The constitutional deprivation of the right to have the jury properly charged with the statutory defenses has contributed to the conviction in this case. Indeed, the defensive theme in the case was about the very law incorrectly given to the jury. It can, under no circumstances, be said that beyond a reasonable doubt, the error did not contribute to the conviction. TEX. R. APP. P. 44.2(a). This Honorable Court should reverse this conviction and remand for a new trial.

# PRAYER

Appellant respectfully prays that this Honorable Court find Appellant was egregiously harmed by the individual errors in the jury instructions and that the matter be reversed and remanded. In the alternative, Appellant prays this Honorable Court find the cumulative effect of the error in the jury instructions resulted in a constitutional due process violation and the matter be reversed and remanded. Appellant prays for any other relief to which she may be entitled in equity or at law.

Respectfully submitted,

Gary E. Prust
State Bar No. 24056166
1607 Nueces St.
Austin, Texas 78701
(512)469-0092
Fax (512)469-9102
gary@prustlaw.com
Attorney for Karra Trichele Allen

## CERTIFICATE OF SERVICE

In compliance with TEX. R. APP. PROC. 9.5(b)(1), (d), and (e) the undersigned attorney certifies that a true and correct copy of the foregoing Brief was served at or before the time of its filing upon Mr. Gary Bunyard through electronic via the electronic filing manager through efile.txcourts.gov on the 26th day of September, 2016.

Gary E. Prust

## CERTIFICATE OF COMPLIANCE

I hereby certify Appellant's Brief contains 16,413 words, excluding those parts so allowed in TEX. R. APP. PROC. 9.4(i)(1) and is not in compliance with TEX. R. APP. PROC. 9.4(2)(B). In so certifying, I rely upon the word count function of the computer program used in preparation of this document. In conjunction with the filing of this brief, Appellant has filed a motion to exceed word count.

Gary E. Prust

69

# Appendix

Appendix A
Extracted Pages from jury instructions on self-defense ........................................... A

Appendix B
Extracted Pages from Dr. Busch's testimony ............................................................... B

1. the defendant, in Burnet County, Texas, on or about the 1st day of July, 2013, caused the death of Brian Allen by shooting him with a firearm; and

2. the defendant did this either intentionally or knowingly.

The state has the burden of proving each of the elements above beyond a reasonable doubt.

## The Verdict

The law requires that you render a verdict of either "guilty" or "not guilty." The verdict of "not guilty" simply means that the state's evidence does not prove the defendant guilty beyond a reasonable doubt.

You may return a verdict only if all twelve of you agree on this verdict.

When you reach a verdict, the foreperson should notify the court.

## Defenses

Voluntary intoxication is not a defense to a criminal offense.

The term "**intoxication**" means a disturbance of mental or physical capacity resulting from the introduction of any substance into the body.

If you all agree the state has proved, beyond a reasonable doubt, each of the two elements listed above, you must next consider whether the defendant's use of force was made in self-defense.

## Self-Defense

A person's use of deadly force against another that would otherwise constitute the crime of MURDER is not a criminal offense if the person reasonably believed deadly force was immediately necessary to protect the person against the other's use or attempted use of unlawful deadly force.

Self-defense does not cover conduct in response to verbal provocation alone. The defendant must have reasonably believed the other person had done more than verbally provoke the defendant.

## The Relationship between Karra Trichele Allen and Brian Allen

You may consider all relevant facts and circumstances surrounding the death of Brian Allen, and the previous relationship existing between Karra Trichele Allen and Brian Allen, together with all relevant facts and circumstances going to show the condition of the mind of Karra Trichele Allen at the time of the offense alleged in the indictment.

## Burden of Proof

The defendant is not required to prove self-defense. Rather, the state must prove, beyond a reasonable doubt, that self-defense does not apply to the defendant's conduct.

## Definitions

**"Reasonable belief"** means a belief that an ordinary and prudent person would have held in the same circumstances as the defendant.

**"Deadly force"** means force that is intended or known by the person using it to cause death or serious bodily injury or force that in the manner of its use or intended use is capable of causing death or serious bodily injury.

**"Unlawful"** means criminal or tortious or both and includes what would be criminal or tortious but for a defense not amounting to justification or privilege.

## The Indicted Offense

Now bearing in mind the foregoing instructions, if you believe beyond a reasonable doubt, that the Defendant, KARRA TRICHELE ALLEN, on or about the 1st day of July, 2013, in the County of Burnet and State of Texas, as charged in the indictment, did then and there intentionally or knowingly cause the death of an individual, namely, Brian Allen, by shooting him with a firearm, you will find the Defendant guilty of the offense of MURDER and so say by your verdict, but if you do not so believe or if you have a reasonable doubt thereof, you will acquit the Defendant of the offense of MURDER and say by your verdict "not guilty".

If you have found that the state has proved the offense beyond a reasonable doubt, you must next decide whether the state has proved that the defendant's conduct was not justified by self-defense.

To decide the issue of self-defense, you must determine whether the state has proved, beyond a reasonable doubt, one of the following:

1. The defendant did not believe her use of deadly force was immediately necessary to protect herself against Brian Allen's use or attempted use of unlawful deadly force; or

2. The defendant's belief was not reasonable.

You must all agree that the state has proved, beyond a reasonable doubt, either element 1 or 2 listed above. You need not agree on which of these elements the state has proved.

If you find that the state has failed to prove, beyond a reasonable doubt, either element 1 or 2 listed above, you must find the defendant "not guilty."

If you all agree the state has proved, beyond a reasonable doubt, each of the elements of the offense of MURDER, and you all agree the state has proved, beyond a reasonable doubt, either element 1 or 2 listed above, you must find the defendant "guilty."

In determining the issue of self-defense it is your duty to consider all relevant facts and circumstances surrounding the alleged offense and the previous relationship, if any, existing between Karra Trichele Allen and Brian Allen, the words, including acts and conduct of the said Brian Allen together with all relevant facts and circumstances going to show the condition of the mind of Karra Trichele Allen at the time of the alleged offense.

Now, therefore, bearing in mind the foregoing definitions and instructions, if you believe from the evidence beyond a reasonable doubt that the Defendant, Karra Trichele Allen, in the County of Burnet and the State of Texas, on or about the 1st day of July, 2013, as alleged in the indictment, did then and there intentionally or knowingly cause the death of an individual, namely, Brian Allen, by shooting him with a firearm, BUT you further find from the evidence, or have a reasonable doubt thereof, as viewed from the Defendant's standpoint alone, that the Defendant reasonably believed that deadly force when and to the degree used, if it was, was immediately necessary to protect herself against the use or attempted use of unlawful deadly force, either real or apparent, by the said Brian Allen, you will acquit the Defendant of the offense of MURDER and say by your verdict "Not Guilty" .

## RULES THAT CONTROL DELIBERATIONS

You must follow these rules while you are deliberating and until you reach a verdict. After the closing arguments by the attorneys, you will go into the jury room.

Your first task will be to pick your foreperson. The foreperson should conduct the deliberations in an orderly way. Each juror has one vote, including the foreperson. The foreperson must supervise the voting, vote with other members on the verdict, and sign the verdict sheet.

While deliberating and until excused by the trial court, all jurors must follow these rules:

1. You must not discuss this case with any court officer, or the attorneys, or anyone not on the jury.

2. You must not discuss this case unless all of you are present in the jury room. If anyone leaves the room, then you must stop your discussions about the case until all of you are present again.

3. You must communicate with the judge only in writing, signed by the foreperson and given to the judge through the officer assigned to you.

~ 6 ~

Appendix B

A    Yes.

Q    And what was your opinion?

A    I would say that he was an abusive husband to Trichele over many years.

Q    All right.  Does -- some of the documents that you were provided, does he even say out of his own mouth he's an abuser?

A    Yes, he does.

Q    And he told that to his counselor?

A    Yes, he did.

Q    And that was -- what year was that; do you recall?

A    That was just prior to his death.

Q    So he's telling a counselor just prior to his death that "I'm an abuser"?

MR. MCAFEE:  Objection to leading.  We haven't objected for a while but objection.

THE COURT:  All right.  Sustained.

Q    (By Mr. Shell) Is that accurate?

A    Yes.

Q    Did you have an opinion, based upon everything that you've reviewed -- and I'll focus your attention on the texts the day of the incident where they both told each other basically we're getting a divorce, this is it, I'm done -- whether or not this violence that you observed was escalating?

A    It was both escalating that day and in the years and

months preceding Brian's death, Mr. Allen's death.

Q Based upon everything that you reviewed and your studies, including the papers that you've written and the research you've done at the institute on domestic violence, were you able to come to a likely probability as to whether or not Trichele feared for her life on this particular day?

A Yes.

Q And what was your opinion?

MR. MCAFEE: Objection. That's an ultimate fact for the jury.

MR. SHELL: That's not a proper objection. A witness can state the ultimate fact from a jury. Want to research? I can show you cases on that.

THE COURT: I'll overrule the objection.

Q (By Mr. Shell) Did you have an opinion?

A Yes.

Q And what was your opinion about that?

A In reviewing all those documents and from other collaterals, my opinion was -- although I was not there that night -- that it led to force, a defense of her life, because of the accumulated violence over time and the escalating violence over time by Brian to Trichele.

MR. SHELL: I'll pass the witness.